This suit is brought for specific performance of an agreement to sell real estate. Sometime prior to April 25th, 1944, the complainants, Patrick Monahan and his wife, Nora, read an advertisement in a newspaper to the effect that the defendants, Gerald A. McElligott and Ellen McElligott, desired to sell their property at 701 Woodland Avenue, Roselle Park, *Page 307 
New Jersey. Thereupon several visits were made by the complainants to the home of the defendants and negotiations were opened and discussions had between them as to the price for the property, with the result that the price agreed upon finally was the sum of $9,300.
There was produced in evidence on the hearing the following agreement and receipt:
"April 25, 1944.
I hereby agree to sell my property at 701 Woodlawn Ave. Roselle Pk. New Jersey to Patrick Monahan and Nora C. Monahan for the sum of Ninety three hundred ($9,300) dollars.
I hereby acknowledge receipt of the sum of Two Hundred ($200) Dollars, balance of ($9,100) to be paid at closing of transaction.
 PATRICK MONAHAN NORA C. MONAHAN. GERALD A. McELLIGOTT ELLEN McELLIGOTT." "4-25-1944.
Received from Patrick Monahan, the sum of Two Hundred Dollars (200.00 as a deposit on a 2 1/2 story frame and brick one family dwelling situated on a lot 40' x 100' and known as 701 Woodland Avenue, Roselle Park, New Jersey. Price agreed Nine Thousand, three hundred dollars. $9,300.00.
 GERALD A. McELLIGOTT ELLEN McELLIGOTT."
It is not disputed that both the agreement and receipt were handed to the complainants by the defendant Ellen McElligott, on the day of the date which they bear and that when they were tendered to complainants, they objected because the defendant Gerald A. McElligott's name was not signed thereon, whereupon Mrs. McElligott signed her husband's name to both papers.
The defense offered on the hearing was (1), that Gerald A. McElligott did not sign nor authorize his wife to sign his name to the receipt and the agreement, and (2) that Mrs. McElligott signed and delivered both in contemplation of the drawing of a formal contract.
It appears from the evidence that about fifteen days after the deposit was paid Monahan received a letter from the Central Home Trust Company at which institution he applied for a mortgage loan and brought it to the home of the *Page 308 
defendants where he spoke to Mr. McElligott. He says Mrs. McElligott was not at home and that he handed the letter to Mr. McElligott saying, "This is from the bank in reference to the deed." "I would like to get that deed down to the bank," to which McElligott replied, "Well, Mrs. McElligott isn't home and I don't exactly know where to lay my hands on the deed, which the deed is in the house. As soon as Mrs. McElligott gets home from her trip, I will see the deed gets to the bank." Monahan says, "I told him then, I says, `I had my house sold and these people just pulled out.' I showed him that letter. I didn't have enough money for a down payment. So I said, `I will have to get a little more mortgage,' for the same reason. I said, `How much mortgage do you really think I could get here?' `Well,' he says, `I don't see — You can get plenty of mortgagees. You can get at least six or seven thousand dollars.' `After all,' I said, `I don't need that much. I am only paying ninety-three hundred for this place. I don't really need that much. If I could get five thousand, that is all I would need.'" "Q. What did he say? A. Well, he said, `You will get that easily enough.'"
This conversation related by the complainant Monahan is not denied by the defendant McElligott. Two days later Monahan again went to the defendants' home and saw both defendants and again requested the deed at which time Mr. McElligott said, "No, we haven't sent it down yet."
Up to that time the witness says the understanding was that title was to be closed July 1st, but that on a later occasion when he went to see both defendants they said, "Well, we can't find a place where we were supposed to go," and asked him if he could give them until September 1st and wanted him to take back his deposit which he refused to do. The defendants also at that time said to Monahan that if the title was to be closed September 1st they would have to have a new contract to which Monahan says he replied, "If it is going to be like this, I have got to turn it over to my lawyer." There was also something said at that time about the payment of an additional $1,000 on account of the purchase price, all of which Monahan refused to do. *Page 309 
Mr. McElligott called by the complainants as a witness testified that certain portions of the receipt are in his handwriting. The receipt is typewritten with the exception of the words "Patrick Monahan," "Two Hundred Dollars (200.00)" and "Nine Thousand, three hundred Dollars. $9,300.00." The portions of the receipt which Mr. McElligott said were in his handwriting are "Monahan," "$200.00" and "$9,300.00." He says the signature "Gerald A. McElligott" attached thereto is not his handwriting.
The defendant Ellen McElligott identified her signature to both papers. She says that when Mr. Monahan came to the house (which was after the price for the property had been agreed upon by all parties), "I told him that my husband had left a receipt for that $200, which they were to deliver the night before. Mr. McElligott left it because I didn't know that Mr. Monahan's first name was, I filled in the `Patrick Monahan' and when Mr. Monahan showed me his receipt — I showed him the receipt I had, he also handed me this. (Indicating the agreement to sell prepared by the bank.) I read it over and asked him, why their names was on the receipt. He said that the bank wanted their names on there. He said that they wanted them on there as they were on their deed. * * * I said, `Well, you don't need my husband's signature on the receipt for $200. My husband's signature is not necessary.' He said, `I don't know. All I know is the bank asked me.' He said, `Aren't both your names on your deed?' And I said, `Yes, they are.' And then I told him I would put my husband's name on here."
Mrs. McElligott says that she and her husband were going to move to Massachusetts and that she went up to Massachusetts to look for a place and told complainants "I would try to let them have it by July 1st, if possible." She also says that her husband wrote everything in the receipt except the words "Patrick Monahan" and that the receipt had been written out at the time she put the ad in the paper "in case anybody came in and took the property," and that her husband filled in the purchase price and the amount of deposit later. In reply to the court's question "So that your husband had *Page 310 
agreed all the time to sell it at that price?" She answered "That is right." And to another question "He authorized you to sign and take the deposit for anybody that wanted to buy?" the witness replied, "That is right, your honor."
Mr. McElligott said that all he wanted was time until September to remove from the premises, and when asked "Well, now September had gone and passed, and that was all you wanted: you wanted to stay until September?" he replied, "That is right, your honor." "Why don't you want to give the title now?" "Just because this has caused so much of a fuss in between and Mrs. McElligott has become so terribly upset about the whole thing that I do not care to go through with the deal."
The proof clearly establishes that the minds of the parties met in every essential detail requisite for the making of a valid contract for the sale of real property. The defendants wanted to sell and move elsewhere. Complainants agreed to buy. The deposit and the price was agreed to in conferences between complainants and both defendants. When the deposit was paid, the evidence makes it clear that the wife had authority from her husband to hand over a receipt prepared by him and left with her for the express purpose of issuing it to the complainants. I hold that the receipt of itself was sufficient to bind the parties and that the circumstances here are such that it may be reasonably inferred that the wife had authority from her husband to affix his signature thereto as well as to the agreement of sale prepared by the bank, and that she was his agent for that purpose. Moreover, that McElligott in conversation with the complainant Monahan, ratified and confirmed such authority in his wife.
In Lindley et al. v. Keim, 54 N.J. Eq. 418;34 Atl. Rep. 1073, it was said:
"* * * The learned Vice-Chancellor laid down three propositions which he applied in the trial of this cause, the correctness of which has not been, and, I think, could not be, successfully contested. The first proposition is that authority to sign a memorandum of agreement for the sale of lands may be conferred by parol, and authority so conferred will satisfy the provisions of our statute of frauds. In some states *Page 311 
the statute of frauds has been extended so as to require that such authority shall be exhibited by writing. Reid St. Fr., §380. But our statute has never been thus extended, and it needs no citation of authorities to show that the construction of the statute from which ours was taken, and which construction we follow, has been, however inconsistent with its general purpose, that authority to sign a memorandum of agreement for the sale of lands (which is required to be in writing) need not be conferred by writing, but may be conferred by parol. But obviously courts should require proofs of authority conferred by parol in such case to be clear and decisive, or the wholesome provisions of the statute of frauds may be thus evaded.
"The second proposition was that such authority to sign an agreement for the sale of land could be established either by proof that it had been expressly conferred, or by proof of circumstances from which its grant may be reasonably inferred.
"The last proposition was that a signature for another to such an agreement, if done without antecedent authority, expressly or impliedly conferred, may be ratified by the person for whom the signature was made, and that such ratification would establish authority to make it as effectually as proof that such authority had been expressly conferred. * * *"
A memorandum of a contract for the sale of land complies with the statute of frauds, though it does not in terms state an agreement to sell, if from a consideration of the whole memorandum it may be gathered that it is the intention of one party to convey and the other party to purchase. Wollenburg v.Rynar, 96 N.J. Eq. 38; 124 Atl. Rep. 361; Bateman v. Riley,72 N.J. Eq. 316; 73 Atl. Rep. 1006.
The defendant McElligott prepared and wrote the receipt for the deposit which the complainants received. Upon the theory that all persons are inherently honest, it must be presumed that he intended to carry out his agreement. He will in good equity be held to have so intended and bargained.
The receipt and the agreement read together form a complete contract in which is set forth the amount of deposit, *Page 312 
the purchase price and the description of the property, and where the time for passing title is not fixed, the contract will be construed to provide for the delivery of the deed on demand, within a reasonable time, accompanied by a tender of the balance of the purchase price. Reynolds v. O'Neil, 26 N.J. Eq. 223,225.
In the instant case it is admitted that legal tender for the balance of the purchase price was made. The agreement meets the requirements of the law as announced in the cases. But even if it were not a complete written contract it is a sufficient memorandum of an oral agreement to satisfy the statute of frauds.Celendano v. Blazejewski, 98 N.J. Eq. 45; 129 Atl. Rep. 708.
No legal obstacle is here perceived to the enforcement of the agreement and there will be a decree for specific performance.